IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD O'REGAN and ANA VIQUEZ, as Parents and Natural Guardians of L.O., <br><br> *Plaintiffs,* <br><br> v. <br><br> CENTRAL BUCKS SCHOOL DISTRICT, <br><br> *Defendant.* | CIVIL ACTION <br> NO. 24-6437 |

**Pappert, J.**                                                                 January 17, 2025

**<u>MEMORANDUM</u>**

Over the course of several days in the fall of 2024, some Central Bucks High School South students, primarily a young woman and two boys who are brothers, engaged in horseplay on the school bus that included matters of a sexual nature. When a teacher heard about it, she contacted a school principal who began to investigate. After meeting with the girl and the brothers, the principal spoke with those students' parents and reviewed school bus security camera footage. She then contacted the school district's Title IX Coordinator and they decided to investigate further and sign a formal Title IX complaint, something the students and their families had not done. The Complaint then listed five students, with the young woman as a complainant against the two brothers and two other boys, and the boys all (individually) as complainants against the girl. One of the other boys added to the complaint was L.O., who had previously been considered a witness, not a party, to the incidents.

L.O.'s parents sued the Central Bucks School District ("the District") seeking a declaratory judgment and alleging, pursuant to 42 U.S.C. § 1983, that the District's

1

Title IX proceeding violated L.O.'s due process rights. They then moved for a preliminary injunction seeking to enjoin the District's proceeding, the only part of which that now remains is for the District to announce its decision based on the investigation. The Plaintiffs allege that the District denied L.O. a "meaningful opportunity to be heard" and that the District proceeding ran afoul of the regulations promulgated pursuant to Title IX.

After considering the parties' submissions and the evidence presented at a hearing, the Court denies the motion because the Plaintiffs failed to establish that they are likely to succeed on the merits of their claims or suffer irreparable harm in the absence of a preliminary injunction. L.O. received all the process (and more) to which he was due and while the District may not have strictly complied with the regulations' requirements, nothing it did prejudiced L.O. or, if done differently, would have changed anything. And Plaintiffs' purported irreparable harm is speculative at best and could likely be remedied by monetary damages or other relief.

I

A

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Federal departments or agencies that provide financial assistance to education programs or activities are authorized to effectuate this prohibition "by issuing rules, regulations, or orders" and

can enforce those requirements by "any . . . means authorized by law," including terminating funding. *Id.* § 1682.

Pursuant to that authority, the Department of Education promulgated regulations applicable to recipients of funds disbursed by the Department.[1] *See* 34 C.F.R. §§ 106.01 *et seq.* (2020) ("the Regulations").[2] The Regulations require each recipient to designate one or more employees as the "Title IX Coordinator" responsible for coordinating the recipient's compliance with the Regulations. *Id.* § 106.8(a). Recipients must also adopt a grievance process for resolving "formal complaints." *Id.* § 106.8(c). A formal complaint is a "document filed by a complainant or signed by the Title IX Coordinator alleging sexual harassment against a respondent and requesting that the recipient investigate the allegation." *Id.* § 106.30(a).

Sexual harassment is "conduct on the basis of sex" that constitutes, *inter alia*, "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access" to the education program or activity. *Id.* § 106.30(a). An alleged victim of conduct that might

---

[1] A "recipient" is "any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance." 34 C.F.R. § 106.2(i). The District is subject to the Regulations.

[2] All citations to the Regulations refer to the regulations as enacted in 2020. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026 (May 19, 2020). New regulations were promulgated in April of 2024 and took effect the following August. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed Reg 33474 (Apr. 29, 2024). But several of the District's schools, including Central Bucks High School South, have been operating under the 2020 regulations pursuant to a preliminary injunction that enjoined the new regulations in "any school attended by a minor child of a member of Moms for Liberty." *See Kansas v. United States Dep't of Ed.*, No. 24-cv-4041, 2024 WL 3273285, at *18–21 (Dist. Kan. July 2, 2024); Notice of Second Supplemental List of Schools at 40, Kansas v. United States Dep't of Ed., No. 24-cv-4041 (Dist. Kan. Aug. 28, 2024), ECF No. 80-1.

be sexual harassment is called a complainant, while an alleged perpetrator is called a respondent. *Id.* § 106.30(a). A Title IX Coordinator who signs a formal complaint "is not a complainant or otherwise a party." *Id.* § 106.30(a).

The Regulations detail specific requirements for recipients' grievance processes. *Id.* § 106.45(b). Upon receipt of a formal complaint, recipients must provide written notice of the grievance process to known parties. *Id.* § 106.45(b)(2)(i)(A). This notice must also provide "sufficient details known at the time," including the parties involved, if known; the alleged conduct; and the date and location of the conduct, if known. *Id.* § 106.45(b)(2)(i)(B). The notice must be given "with sufficient time to prepare a response before any initial interview." *Id.*

The Regulations also impose requirements that apply to recipients "[w]hen investigating a formal complaint and throughout the grievance process." *Id.* § 106.45(b)(5). During this time, recipients must give the parties an opportunity to present witnesses and evidence, inspect evidence already obtained and have counsel present during any proceeding or meeting, and must provide a party written notice of any hearing, interview or meeting at which the party is expected to participate. *Id.* § 106.45(b)(5)(ii), (iv)–(vi).

Before a recipient's investigator completes the "investigative report" summarizing the relevant evidence for the decisionmaker, *id.* § 106.45(b)(5)(vii), the parties must be given an opportunity to respond to the evidence in writing, *id.* § 106.45(b)(5)(vi). And after the report is completed, they must also be given an opportunity to respond to it in writing, *id.* § 106.45(b)(5)(vii), as well as an opportunity to submit questions to any party or witnesses, *id.* § 106.45(b)(6)(ii). After a decision is

4

reached, the parties must be afforded an opportunity to appeal on any of three bases: a "procedural irregularity that affected the outcome of the matter"; new, previously unavailable evidence that might affect the outcome; and bias or a conflict of interest by the Title IX Coordinator, investigator or decisionmaker that had an effect on the outcome. *Id.* § 106.45(b)(8)(i).

Even absent a formal complaint, recipients with "actual knowledge" of sexual harassment "must respond promptly in a manner that is not deliberately indifferent." *Id.* § 106.44(a), (b)(1). Actual knowledge exists where "notice of sexual harassment or allegations of sexual harassment" is given to a Title IX Coordinator, an official authorized to take corrective measures, or any elementary or secondary school employee. *Id.* § 106.30(a). A recipient with actual knowledge must follow its regulation-compliant grievance process before imposing any discipline, and the Title IX Coordinator "must promptly contact the complainant" and explain the formal complaint process. *Id.* § 106.44(a).

In compliance with the Regulations and its own Title IX policy, the District enacted a grievance process, (Hr'g Ex. P-4), pursuant to which they conducted the proceeding against L.O., *see* (Hr'g Tr. at 84:12–14, 118:4–11). Plaintiffs do not dispute that the District's policy complies with the Regulations. (*Id.* at 20:14–16, 151:7–9.)

B

On October 1, 2024, J.F., a student at Central Bucks High School South, told Erin Scholl, his emotional support teacher, about a series of incidents involving his brother, D.F., and G.R., a young woman with Down syndrome, in the back of their school bus. (Hr'g Tr. at 27:2–11, 28:16–29:3.) J.F. told Scholl that G.R. said she was

5

dating D.F. and pregnant with his baby, pretended to be pregnant, tried to kiss D.F., who once had to push her off of him, and once hit D.F. between the legs. (*Id.* at 32:6–11; Hr'g Ex. P-1.) Scholl believed J.F. was "frustrated [] and overwhelmed," and based on the nature of the behavior he described, decided to tell Jennifer Opdyke, a principal at CB South, about the conversation. (Hr'g Tr. at 29:19–32:18.)[3]

Scholl emailed Opdyke on October 2 and Opdyke spoke with J.F., D.F. and G.R. that day. (*Id.* at 35:21–36:20.) During those conversations, Opdyke took notes that she later transcribed into an electronic document. (*Id.* at 37:7–38:12; Hr'g Ex. P-3.) J.F. and D.F. confirmed J.F.'s earlier account to Scholl, and G.R. admitted to and apologized for the conduct. (Hr'g Tr. at 36:21–37:2; P-3 at 1–2.) Concerned that an attempt to kiss D.F. and punching him between the legs might implicate the sexual assault provision of the District's Title IX policy, Opdyke called the students' parents to tell them of the situation and requested security camera footage from the school bus. (Hr'g Tr. at 38:16–39:2, 42:9–12, 43:7–13, 44:7–12.) At the time, Opdyke did not have information that implicated other aspects of the District's Title IX policy. (*Id.* at 43:2–6.)

Opdyke requested from the District's transportation department video footage from the bus for September 16 through September 27. (*Id.* at 44:7–12; Hr'g Ex. P-3 at 2.) She received those recordings late on October 3 and began reviewing them the following day. (Hr'g Ex. P-3 at 2.) Concerned about what happened on the bus on September 16, Opdyke discussed the matter with two other CB South employees, who recommended contacting Alyssa Wright, the District's Title IX Coordinator. (Hr'g Tr. at 45:9–46:16; Hr'g Ex. P-3 at 2.)

---

[3]     Opdyke's official title is "House Principal," which means she oversees a specific graduating class for the duration of their time at CB South. (Hr'g Tr. at 33:20–34:5.)

Opdyke and Wright spoke by phone later that day, and by the end of the conversation decided to investigate the misconduct and sign a formal complaint under the Title IX policy.  (Hr'g Tr. at 47:13–19; Hr'g Ex. P-3 at 2.)  Opdyke contacted the students' families and told them about the investigation and their right to file a formal complaint on behalf of their children.  (Hr'g Tr. at 47:19–48:25; Hr'g Ex. P-3 at 2.)  Neither family chose to do so.  (Hr'g Tr. at 48:7–25.)

On October 9, Opdyke identified and interviewed students on the school bus who may have witnessed what happened.  (*Id.* at 49:4–14; Hr'g Ex. P-3 at 2.)  Upon determining that a student sat on the bus near D.F., J.F. and G.R., Opdyke asked them if they had seen anything on the bus that made them or others uncomfortable.  (Hr'g Tr. at 50:18–23.)  L.O. was one of the students interviewed.  (*Id.* at 50:24–51:1; Hr'g Ex. P-3 at 3.)

Between October 10 and October 13, Opdyke transcribed six days' worth of bus footage.  (Hr'g Tr. at 51:2–52:8; Hr'g Ex. P-3 at 3-11.)[4]  On October 17, based on her review, Opdyke interviewed a previously unidentified student for the first time and re-interviewed two other students, including L.O.  (Hr'g Ex. P-3 at 11.)  On October 17, she emailed Wright names of students and their status in the investigation.  (Hr'g Tr. at 54:23–55:4, 56:19–57:5.)  L.O.'s name was on that list, followed by the phrase "witness, maybe respondent."  (*Id.* at 55:11–12; Hr'g Ex. P-5.)  Opdyke testified that at the time she sent the email, she wasn't sure whether to include L.O. as a respondent, so

---

[4]     Opdyke viewed ten days' worth of footage, but on four of those days G.R. was not on the bus and there was no conversation related to the incidents; on one day, G.R. was not present but the students' conversation concerned the situation, so Opdyke transcribed the video from that day.  (Hr'g Tr. at 52:13–25; Hr'g Ex. P-3 at 3–11.)

7

she discussed the matter with Wright. (*Id.* at 55:19–56:24.) They subsequently concluded that L.O. should be named a respondent. (*Id.* at 57:6–12.)

Opdyke then finalized the District's reporting form, signing it on October 18. (*Id.* at 58:7–63:18; Hr'g Ex. P-8.) Wright then emailed a copy of the form, the District's Title IX policy and anti-bullying policy, and a letter to the parents of five students: D.F., J.F., G.R., L.O. and R.W. (Hr'g Tr. at 58:1–2, 64:20–67:18; Hr'g Ex. P-9.) The letter, signed by Wright and entitled Notice of Complaint Received, explained that G.R. was a complainant against the other four students, all of whom are male, and described the allegations. (Hr'g Ex. P-10 at 1–2). The Notice also described the District's Title IX grievance process. (*Id.* at 2–3.) Neither the reporting form nor the Notice listed L.O. as a complainant, *see* (Hr'g Ex. P-8 and P-10), but emails from the District's counsel confirm that L.O., as well as the other boys, was considered a complainant as well as a respondent with respect to G.R., *see, e.g.*, (ECF No. 3-3.) According to the Notice, the bus video showed L.O. talking with other students about the incidents, videoing an interaction between G.R. and D.F and showing a student video of an incident, but told Opdyke that he didn't film anything. (Hr'g Ex. P-10 at 1.) As a complainant, L.O. was, along with the other students, subject to G.R.'s inappropriate conduct. (ECF No. 3-5.)

On October 24, Opdyke emailed the students' parents to schedule meetings to review the bus videos, which were then held on October 28 and 29. (Hr'g Ex. P-12; Hr'g Tr. at 72:12–18.) L.O.'s parents chose to view only those videos in which he appeared. (Hr'g Tr. at 72:23–74:7.)

Opdyke and Wright then wrote the Title IX Investigative Report for the decisionmaker, Joe Piselli, another principal at CB South. (Hr'g Tr. at 35:9–14; 73:8–

8

20.)  The Report was provided to the students' parents or counsel on December 5.  (Hr'g Ex. P-13.)  They were given ten school days to review the report and ask questions of each other.  (Hr'g Tr. at 110:10–16; ECF No. 16-4.)  Once this process concluded, the Report and the questions and answers were sent to Piselli.  (Hr'g Tr. at 110:17–20.)  Because everything is now with Piselli, an injunction would only prohibit the District from releasing his decision concerning L.O.  *See* (Hr'g Tr. at 161:3–5.)  If Piselli finds L.O. responsible for violating the District's Title IX policy, he could impose a variety of sanctions, including suspension.  (*Id.* at 183:22–25; Hr'g Ex. P-4 at 6.)

II

A preliminary injunction is an "extraordinary and drastic remedy," so the movant bears the burden of making a "clear showing" that it is entitled to such relief. *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec'y*, 108 F.4th 194, 202 (3d Cir. 2024) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  Those seeking a preliminary injunction must establish that they are: (1) likely to succeed on the merits; (2) likely to suffer irreparable harm in the absence of the preliminary injunction; (3) "that the balance of equities tips in [their] favor"; and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  The first two elements "are the 'most critical,' and only if both are present will the court "then balance[] all four factors."  *Delaware State Sportsmen's Ass'n, Inc.*, 108 F.4th at 202.  Although plaintiffs need not prove their case with "airtight certainty," they nevertheless "bear[] a heavy burden on a motion for a preliminary injunction." *Punnett v. Carter*, 621 F.2d 578, 588 (3d Cir. 1980).

III

To show a likelihood of success on the merits, the moving party need only prove a *prima facie* case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001). In other words, a likelihood of success means "a reasonable chance, or probability, of winning," not "more likely than not." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011). Plaintiffs contend the District's Title IX proceeding violated L.O.'s due process rights and is, in any event, unlawful because the District failed to follow the Regulations. Neither argument is correct.

A

Where state law creates a right to public education, the state must follow the minimum requirements of the Due Process Clause before it can suspend a student for misconduct. *Goss v. Lopez*, 419 U.S. 565, 573–75 (1975). The student must receive "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. But "[t]here need be no delay" between notice, hearing and discipline, and the Due Process Clause does not require "even truncated trial-type procedures" for brief suspensions. *Id.* at 582–83.

L.O. was afforded significantly greater process and protections than those required by *Goss*. He was allowed to view the bus videos and offer evidence in his favor, respond in writing to the allegations against him, ask questions of other students and hire counsel. *See* (Hr'g Tr. at 72:12–73:7, 110:10–16, 166:24–167:10); *cf.* 34 C.F.R. § 106.45(b)(5).

Plaintiffs nonetheless contend that L.O. was denied a meaningful opportunity to be heard. (Hr'g Tr. at 21:8–17, 166:24–169:6, 172:6–173:3; Pl. Mot. at 11–12.) L.O. wanted to offer, as a respondent, an argument he says would have conflicted with an argument he wanted to present as a complainant. (Hr'g Tr. at 167:21, 169:6.) Specifically, as a respondent, L.O. claims he could have argued that G.R.'s disability caused her conduct and his response was appropriate, while as a complainant, he could have claimed that G.R.'s disability was irrelevant, and she understood and intended her conduct to be harassing. (*Id.* at 168:8–11, 169:1–4.) In short, L.O. was purportedly concerned that proffering these "inconsistent positions" before a single decisionmaker would adversely affect his chances. *See* (*id.* at 21:14–17, 169:6, 173:1–3; Pl. Mot. at 11.)[5]

There is nothing inherently contradictory in saying that (1) G.R.'s disability prevents her from understanding that L.O.'s conduct was appropriate and yet (2) she is able to understand that she sexually harassed L.O. — especially given that the students' conduct differed. Plaintiffs have not shown that G.R. (or someone with G.R.'s disability) is incapable of understanding different behaviors by different people. And regardless, the ultimate question is whether sexual harassment occurred — which, in this case, is governed by a reasonable person inquiry. *See* 34 C.F.R. § 106.30(a); (Hr'g Ex. P-4 at 3).

---

[5] Plaintiffs do not oppose the consolidation of the male students' complaints into a single proceeding against G.R. or the consolidation of G.R.'s complaints against each male student into a single proceeding; they oppose only the consolidation of G.R.'s complaint against L.O. and L.O.'s complaint against G.R. (Hr'g Tr. at 169:20–170:13.)

Despite Plaintiffs' suggestion to the contrary, (*id.* at 170:9–13, 173:22–24), the Regulations provide for this type of consolidation, *see* 34 C.F.R. § 106.45(b)(4) ("A recipient may consolidate formal complaints . . . by one party against the other party, where the allegations . . . arise out of the same facts or circumstances"); *cf.* (Hr'g Ex. P-4 at 9).

11

Any related inquiries the Plaintiffs decided not to make during the question-and-answer part of the proceeding (Hr'g Tr. at 172:21–173:3) were essentially strategic decisions. Plaintiffs offer no support, factual, legal or otherwise, for the idea that the need to choose between different ways of presenting L.O.'s side of the story rendered a school disciplinary proceeding constitutionally deficient.[6]

B

Plaintiffs also claim that the District's Title IX proceeding is unlawful for two reasons: First, because no victim complained of sexual harassment, (Hr'g Tr. at 148:17–149:20), and second, because the District conducted its investigation before signing a formal complaint, while the Regulations call for the complaint to precede the investigation. (*Id.* at 151:20–152:11, 153:5–154:22.)

1

As an initial matter, Plaintiffs are unlikely to succeed on the merits of these claims because they arguably do not have a cause of action against the District for alleged violations of the Regulations. Title IX contains an implied cause of action for sex discrimination claims. *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 642 (1999); *Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020). But the statute does not appear to create an implied private right of action against recipients for merely failing to comply with the Regulations. *See, e.g., Gebser v. Lago Vista Indep. Sch. Dist.*, 524

---

[6] Plaintiffs suggest the balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), weighs in favor of proceeding before different decisionmakers. (Pl. Mot. at 10–11.) But they have not shown why the facts here alter the balance *Goss* struck, *cf. Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 145 (3d Cir. 2005) (finding *Goss* satisfied where assistant principal, before suspending student for four days for sexual harassment, asked him for his account of the incident), nor that the current procedure creates any risk of error or that there would be any likely value to their proposed safeguard.

U.S. 274, 292 (1998) (noting the Court has not held that Title IX enables plaintiffs to obtain damages for violating "administrative requirements" like enactment of a grievance procedure); *Wells ex rel. Glover v. Creighton Preparatory Sch.*, 82 F.4th 586, 593–94 (8th Cir. 2023) (holding that 20 U.S.C. § 1682 provides no private right of action to enforce that requirement); *cf. Gendia v. Drexel Univ.*, No. 20-cv-1104, 2020 WL 52586315, at *3 (E.D. Pa. Sept. 2, 2020). And to enforce the Title IX regulatory protections through 42 U.S.C. § 1983, Plaintiffs must still point to a right within Title IX. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–85 (2002). They have not done so, and nothing in the language of the statute suggests that Congress intended to confer rights on Title IX investigation respondents who themselves were not victims of sex discrimination. *See* 20 U.S.C. § 1681(a); *cf. Cannon v. Univ. of Chicago*, 441 U.S. 677, 689–94 (1979) (discussing § 1681); *Wells*, 82 F.4th at 594 (discussing § 1682). Plaintiffs are aware of this problem, *see* (Hr'g Tr. at 143:17–24), but do not attempt to overcome it.

2

Even if Plaintiffs could sue the District for failing to follow the Regulations, they fail to show that either of their arguments is likely to succeed. Plaintiffs first contend that when a Title IX Coordinator signs a formal complaint, the allegations must originate in a complaint by someone who alleges they were subject to conduct that rises to the level of sexual harassment. (Hr'g Tr. at 148:10–13, 148:18–24, 149:10–12; Reply at 1, 3.) But the Regulations do not require a Title IX Coordinator's formal complaint to be based on statements by a complainant. Schools, for example, may become aware of alleged misconduct that the complainant refuses to discuss. Under Plaintiffs'

13

interpretation of the Regulations, the school's hands would be tied in such circumstances. There is no support for this reading, and indeed, it would be antithetical to the purposes of the statute and Regulations.

Nor do the Regulations condition the Title IX Coordinator's authority on his or her *certainty* that the allegations constitute sexual harassment. Plaintiffs offer no support for the idea that a good faith, albeit mistaken, belief that conduct could constitute sexual harassment prohibits a Title IX Coordinator from signing a formal complaint and renders any proceeding unlawful. The Regulations do not require that every formal complaint be a sure thing, and account for circumstances in which a formal complaint must be dismissed for failure to allege sexual harassment. *See* 34 C.F.R. § 106.45(b)(3)(i); (Hr'g Ex. P-4 at 8–9).

### 3

#### a

The order in which the District conducted the Title IX proceeding did not prejudice L.O. or affect the investigation or eventual outcome, whatever it might be. As an initial matter, the District is allowed to do investigate prior to signing a formal complaint. *See* 34 C.F.R. § 106.44(a) (requiring recipients "with actual knowledge of sexual harassment" to "respond promptly in a manner that is not deliberately indifferent"); *id*. § 106.45(b)(2)(i)(B) (requiring the notice provide "sufficient details known at the time . . . to prepare a response before any initial interview"); (Hr'g Ex. P-4 at 4, 10) (same). Here, Opdyke admitted that no investigation took place after October 18, when the formal complaint was signed. (Hr'g Tr. at 70:1–71:7.)

14

Even though the District should have signed the formal complaint when Opdyke and Wright decided to proceed under the Title IX policy on October 4, L.O. benefitted from the Regulations' protections and received due, though perhaps technically imperfect, process.[7] But a respondent is nowhere guaranteed a *perfect* process. The Regulations, for example, allow appeals based upon, *inter alia*, a "[p]rocedural irregularity that affected the outcome of the matter," 34 C.F.R. § 106.45(b)(8)(i)(A); (Hr'g Ex. P-4 at 16) (same), not irregularities that made no difference to the ultimate decision. Indeed, reviews of disciplinary proceedings often turn on questions of harm or prejudice. *See, e.g.*, *J.S. ex rel. H.S. v. Bethlehem Area Sch. Dist.*, 757 A.2d 412, 423 (Pa. Comm. Ct. 2000) (finding no prejudice from a possible violation of state statutory due process requirements in a school disciplinary proceeding); *George v. Bd. of Ed. of the Tp. of Millburn*, 34 F. Supp. 3d 442, 455 (D.N.J. 2014) (analyzing § 1983 due process claim by asking whether alleged errors proximately caused the outcome in a disciplinary proceeding); *Elkin v. Fauver*, 969 F.2d 48, 53 (3d Cir. 1992) (noting harmless error analysis applies to review of prison disciplinary proceedings). To succeed on their motion, Plaintiffs must present evidence of prejudice that resulted from the District conducting its investigation prior to signing the formal complaint.

b

Plaintiffs failed to show how signing the formal complaint after the investigation prejudiced L.O. in the proceeding. First of all, the Regulations' requirement that the

---

[7] Plaintiffs argue the Title IX investigation began on October 2, after Scholl emailed Opdyke. (Hr'g Tr. at 154:20–155:4.) And Opdyke testified that the students' statements on October 2 about the attempt to kiss D.F. and the punch between his legs indicated that the Title IX sexual assault provision might be implicated. (*Id.* at 38:16–39:2.) But the Court need not decide whether this preliminary concern, rather than the express decision to proceed under Title IX, required signing a formal complaint because the earlier date has no effect on the Court's analysis.

15

signing of a formal complaint precede a full investigation does not preclude a recipient from later naming someone a respondent based on facts uncovered in the investigation. Here, G.R., J.F. and D.F. were the only students known to be involved in any alleged misconduct on October 4, when Opdyke and Wright decided to proceed under the Title IX policy. And L.O. was considered a witness until October 17 or 18, at which point the formal complaint was signed. The fact that the investigation into G.R., D.F. and J.F. uncovered LO's alleged misconduct, making no further investigation into his actions necessary, does not make the District's proceeding "unlawful."

Even assuming L.O. should have been named in a formal complaint prior to October 18, there was nothing to show that, had he been named, (1) the investigation or other parts of the process would have been different and (2) such a difference could affect Piselli's forthcoming decision. *See* (Hr'g Tr. at 179:3–9.) Plaintiffs point to no violation of the procedural safeguards provided by the Regulations and the District's policy[8], and acknowledge L.O. received all the process he was due under them. (*Id.* at 166:24–167:17).[9]

---

[8]   In addition to the bus footage showing L.O.'s interactions with the other students, Opdyke was concerned that L.O. had been untruthful with her in his October 17 interview. (Hr'g Tr. at 89:2–11.) Plaintiffs admitted that he was. (*Id.* at 128:10–15). Perhaps, had notice been given and L.O. had time to prepare before any "initial interview," 34 C.F.R. § 106.45(b)(2)(i)(B); (H'rg. Ex. P-4 at 10), he would have been more forthcoming. But Plaintiffs offer no evidence that L.O.'s interview answers would have been different had he received such notice. And because the decision to include L.O. in the complaint was also based on what Opdyke saw in the bus footage, an honest answer would only have confirmed the basis for including him as a respondent.

[9]   The Regulations and the District's policy provide that a formal complaint can be signed by the Title IX Coordinator. 34 C.F.R. § 106.30(a); (Hr'g Ex. P-4 at 1, 4, 9). The District's policy also specifies that formal complaints must be made using a designated reporting form. (Hr'g Ex. P-4 at 9.) Here, Opdyke, not Wright, signed that reporting form. (Hr'g Ex. P-8.) Delegation of this responsibility is apparently standard District practice and outlined in employees' Title IX training materials. (Hr'g Tr. at 104:8–14, 195:1–5.) But while a Title IX Coordinator may delegate tasks, recipients may not deviate from the unambiguous language of the Regulations when a responsibility is specifically assigned to the Title IX Coordinator. *See* 85 Fed. Reg. at 30183, 30463 & n.1699.

16

IV

To establish a likelihood of irreparable harm, Plaintiffs must show "they will more likely than not suffer irreparable injury while proceedings are pending." *Delaware State Sportsmen's Ass'n, Inc.,* 108 F.4th at 204.  Irreparable harm "cannot be redressed by a legal or an equitable remedy following a trial." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (citation omitted).  In other words, "[t]he requisite feared injury or harm must be irreparable—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (citation omitted).

The risks of suspension and a disciplinary record for a Title IX violation appear to be Plaintiffs' greatest concerns and the impetus for this suit.  *See* (Pl. Mot. at 14; Pl. Reply at 4, 5; Hr'g Tr. at 126:23–5, 161:17–20).  But the outcome of the disciplinary process has not been announced and, as Plaintiffs acknowledge, the decisionmaker may conclude that L.O. did not violate the District's policy.  (Hr'g Tr. at 161:21–25.)  In fact, Plaintiffs agree that if L.O. is found not responsible for violating any District policy, their suit ends.  (*Id.* at 140:6–13.)  The mere possibility of adverse consequences is too speculative to constitute irreparable injury.  *Cf. Doe v. Princeton Univ.*, No. 18-cv-16239, 2019 WL 161513, at *4, *6 (D.N.J. Jan. 9, 2019).

Plaintiffs argue, without any legal support, that the pending disciplinary proceeding subjects them to irreparable harm in two ways: First, so long as the

---

Concerns about district size and manageability, (Hr'g Tr. at 104:10–11, 194:23–24), ignore the distinction between signing a formal complaint and investigating alleged misconduct.
  There was no evidence, however, that L.O. was prejudiced in any way because Opdyke, rather than Wright, signed the reporting form.  Nor have Plaintiffs shown that the "clerical error" that Opdyke committed by listing L.O. as only a witness, not a respondent, (Hr'g Tr. at 68:9–23), affected the proceeding or, given Wright's Notice (Hr'g Ex. P-10), prejudiced L.O.

combined proceeding is before a single decisionmaker, they suffer an ongoing deprivation of due process, and second, they are forced to endure an unlawful proceeding. (Pl. Mot. at 14; Pl. Reply at 1; Hr'g Tr. at 138:9–11, 145:3–8.)

The mere fact that due process is a constitutional right does not make harm from its deprivation irreparable. *Delaware State Sportsmen's Ass'n, Inc.*, 108 F.4th at 203–04. And Plaintiffs do not explain why a due process deprivation should be treated differently than other constitutional injuries. *Cf. Eaton Corp. v. Geisenberger*, 486 F. Supp. 3d 770, 800 (D. Del. 2020) (noting plaintiffs provided no authority for the proposition that a procedural due process violation constituted irreparable harm), *rev'd in part on other grounds sub nom. Siemens USA Holdings, Inc. v. Geisenberger*, 17 F.4th 393 (3d Cir. 2021); *Spring Creek Rehab. and Nursing Ctr. LLC v. NLRB*, No. 24-cv-9016, 2024 WL 4563789, at *3–*4 & n.4 (D.N.J. Oct. 24, 2024) (noting that the "here-and-now" injury in removal-protection cases does not automatically satisfy the irreparable harm requirement). Plaintiffs' inability to cite any legal authority for this argument is not surprising. If procedural due process deprivations constituted irreparable injury, motions to preliminarily enjoin administrative and disciplinary proceedings would flood the courts, make such relief commonplace and hinder, if not vitiate, countless investigations. *Cf. Spring Creek*, 2024 WL 4563789 at *4.

Plaintiffs likewise offer no authority for the proposition that an unlawfully initiated proceeding creates an irreparable harm for the duration of that proceeding. And a non-due process procedural violation is unlikely to constitute irreparable harm when a due process violation does not.

Plaintiffs are upset by the proceeding and concerned about the effect it has had on L.O.'s mental health and academic performance. (Hr'g Tr. at 125:1–21, 126:5–15.) But the question before the Court is not the seriousness of the harm, but whether it is irreparable. And Plaintiffs have not shown that their alleged procedural deprivations are irreparable or how damages would not compensate them for the harms they describe.[10]

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.

---

[10] Counsel suggested that, where there is no cause of action to recover for damages, no other remedy is available and thus there is irreparable harm. (Hr'g Tr. at 143:17–19.) As discussed above, the absence of a cause of action goes to the likelihood of success on the merits. It would be puzzling to grant the extraordinary remedy that is a preliminary injunction in order to prevent a harm for which a plaintiff cannot recover in the ordinary course of litigation because he lacks a right, remedy or both.